```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
                         SOUTHERN DIVISION

COURTNEY SMITH, a/k/a
COURTNEY ALEXANDER,

            Plaintiff,
                                    NO:  2:24-cv-12065-JJCG-APP

      -vs-
                                    HON. JONATHAN J.C. GREY
FORD FIELD MANAGEMENT, LLC,

            Defendant.


_____

            DEPONENT:  COURTNEY SMITH a/k/a ALEXANDER

            DATE:  Friday, April 25, 2025

            TIME:  10:02 a.m.

            LOCATION:  1901 St. Antoine Street
                       6th Floor at Ford Field
                       Detroit, Michigan

            REPORTED BY:  Colleen R. Joliat, CSR-0923, RPR

                    Certified Court Reporter/Notary Public


APPEARANCES:

NACHTLAW, P.C.
BY:  DAVID A. NACHT  (P47034)
     ALYSA J. WIGGINS  (P88205)
501 Avis Drive, Suite 3
Ann Arbor, Michigan  48108
(734) 663-7550
dnacht@nachtlaw.com
alysajwiggins@nachtlaw.com

        Appearing on behalf of the Plaintiff,


                    Appearances continued....
```



Fortz Legal Support

www.FortzLegal.com

844.730.4066

1                      UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF MICHIGAN
2                            SOUTHERN DIVISION

3    COURTNEY SMITH, a/k/a
     COURTNEY ALEXANDER,
4
                     Plaintiff,
5                                            NO:  2:24-cv-12065-JJCG-APP
         -vs-
6                                            HON. JONATHAN J.C. GREY
     FORD FIELD MANAGEMENT, LLC,
7
                     Defendant.
8

9    _____

10          DEPONENT:  COURTNEY SMITH a/k/a ALEXANDER

11          DATE:  Friday, April 25, 2025

12          TIME:  10:02 a.m.

13          LOCATION:  1901 St. Antoine Street
                       6th Floor at Ford Field
14                     Detroit, Michigan

15          REPORTED BY:  Colleen R. Joliat, CSR-0923, RPR

16                        Certified Court Reporter/Notary Public

17
     APPEARANCES:
18
     NACHTLAW, P.C.
19   BY:  DAVID A. NACHT  (P47034)
          ALYSA J. WIGGINS  (P88205)
20   501 Avis Drive, Suite 3
     Ann Arbor, Michigan  48108
21   (734) 663-7550
     dnacht@nachtlaw.com
22   alysajwiggins@nachtlaw.com

23          Appearing on behalf of the Plaintiff,

24

25                          Appearances continued....

COURTNEY SMITH v FORD FIELD MANAGEMENT, LLC                    Job 40090
SMITH, COURTNEY 04/25/2025                                     2..5

**Page 2**

```
1   APPEARANCES (continued):
2   BODMAN, PLC
    BY:  GARY S. FEALK   (P-53819)
3   201 West Big Beaver Road, Suite 500
    Troy, Michigan 48084
4   (3113) 259-7777
    gfealk@bodmanlaw.com
5
            Appearing on behalf of the Defendant.
6
    ALSO PRESENT:
7
    Todd Argust
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1              TABLE OF CONTENTS
2                                              PAGE
3   Direct Examination by Mr. Fealk  .................  13
4   Cross-Examination by Mr. Nacht  .................  215
5
6   EXHIBITS:
7   Deposition Exhibit #1  ...........................  29
8     (Ford Field Mgmt Application for Employment)
9   Deposition Exhibit #2  ...........................  33
10    (Letter dated 3/27/2003)
11  Deposition Exhibit #3  ...........................  38
12    (Ford Field Marketing Manager Position Description)
13  Deposition Exhibit #4  ...........................  44
14    (FMLA Designation Notice dated 5/21/2015)
15  Deposition Exhibit #5  ...........................  45
16    (Director of Guest Services job title)
17  Deposition Exhibit #6  ...........................  56
18    (email chain dates 2/2/2017 with attachments)
19  Deposition Exhibit #7  ...........................  59
20    (Employee Discussion Memo dated 12/14/17)
21  Deposition Exhibit #8  ...........................  70
22    (FMLA Designation Notice dated 3/22/2019)
23  Deposition Exhibit #9  ...........................  71
24    (FMLA certificate of health condition dated
25    3/21/2019 w/Fax cover letter)
```

**Page 4**

```
1   EXHIBITS (continued):                         PAGE
2   Deposition Exhibit #10  ..........................  73
3     (email chain w/attachments dated 1/19/2024)
4   Deposition Exhibit #11  ..........................  96
5     (email chain dated 7/18/2022)
6   Deposition Exhibit #12  ..........................  97
7     (cover letter dated 7/21/2022 with email
8     attachments)
9   Deposition Exhibit #13  ..........................  120
10    (email dated 5/17/2022)
11  Deposition Exhibit #14  ..........................  121
12    (Director of Guest Services job title)
13  Deposition Exhibit #15  ..........................  141
14    (email chain dated 7/16/2021)
15  Deposition Exhibit #16  ..........................  147
16    (job performance evaluation)
17  Deposition Exhibit #17  ..........................  151
18    (email chain dated 2/1/2022)
19  Deposition Exhibit #18  ..........................  165
20    (job performance summary dated 1/7/2022)
21  Deposition Exhibit #19  ..........................  165
22    (email dated 3/24/2022)
23  Deposition Exhibit #20  ..........................  177
24    (check in meeting document dated 3/15/2022)
25
```

**Page 5**

```
1   EXHIBITS (continued):                         PAGE
2   Deposition Exhibit #21  ..........................  181
3     (Performance Coaching & Feedback Summary-March
4     2022)
5   Deposition Exhibit #22  ..........................  188
6     (Charging Party Courtney Smith Response to
7     Position Statement - EEOC Charge No.
8     471-2023-02603)
9   Deposition Exhibit #23  ..........................  195
10    (email dated 6/7/2022)
11  Deposition Exhibit #24  ..........................  203
12    (rheumatology progress noted dated 8/7/2024)
13  Deposition Exhibit #25  ..........................  206
14    (progress notes - June 2021)
15  Deposition Exhibit #26  ..........................  210
16    (Ford Field Management Employee Handbook)
17  Deposition Exhibit #27  ..........................  214
18    (Employee Handbook updated 11.2004)
19
20
21
22
23
24
25
```

COURTNEY SMITH v FORD FIELD MANAGEMENT, LLC
SMITH, COURTNEY 04/25/2025

Job 40090
6..9

Page 6

1        Detroit, Michigan
2        Friday, April 25, 2025
3        THE COURT REPORTER:  Would you raise your
4  right hand, please?
5        (Witness complies.)
6        Do you solemnly swear or affirm that the
7  testimony you're about to give in this matter will be
8  the truth, the whole truth, and nothing but the truth?
9        **THE WITNESS:  I do.**
10       **- - - - -**
11       **COURTNEY SMITH a/k/a ALEXANDER,**
12  **a witness herein, having been duly sworn, was examined**
13  **and testified under oath as follows:**
14       MR. FEALK:  Let the record reflect that
15  this is the deposition of Courtney Alexander Smith in
16  the Eastern District Michigan case of Courtney
17  Alexander Smith versus Ford Field Management, LLC.
18       This deposition is to be used for all
19  purposes permitted under the Rules of Civil Procedure
20  and the Rules of Evidence.
21       Miss Smith, I'm Gary Fealk, I'm the
22  attorney for Ford Field.  Just like to start with a
23  few instructions.
24       Have you ever had your deposition taken
25  before?

Page 7

1        **THE WITNESS:  Yes, I have.**
2        MR. FEALK:  Okay.  So then this may sound
3  familiar to you.
4        Because this is being recorded by a court
5  reporter, we need you to give audible answers, shaking
6  the head won't do it.  Also, I need you to clearly
7  articulate your answer; uh-huh, ugh-uh, it doesn't
8  show up real good on the transcript and we want the
9  transcript to reflect what you said.  So if I
10  interrupt you I'm not being rude, I'm just trying to
11  make sure we have a good record.
12       If you answer the question I will assume
13  that you understood it.  And if for some reason you
14  don't understand a question, please ask me to clarify
15  and I'll be happy to do so, because we want to get,
16  you know, your truthful answers; and you need to
17  understand what the question is to be able to do that.
18       You understand that you're under oath so
19  you are required to tell the truth, correct.
20       **THE WITNESS:  That is correct?**
21       MR. FEALK:  Now, your attorney may object
22  from time to time.  But we don't have a judge here to
23  rule on whether it's a proper question.  So I'll
24  listen to the objection, and then I'll say go ahead
25  and answer the question.  The only time he may

Page 8

1  instruct you not to answer questions is if I were to
2  do something, which I'm not going to do, like ask you
3  what you talked about with your attorney.  I don't
4  want to know that and I'm not going to ask you about
5  that.
6        We are going to take breaks from time to
7  time.  And if you need a break just let me know.  The
8  only requirement that I have for a break is that if I
9  ask a question I will expect you to answer the
10  question before we take the break.  Do you understand
11  that?
12       **THE WITNESS:  Yes.**
13       MR. FEALK:  Okay.  And you've had your
14  deposition taken before, you're probably aware that
15  we'll probably start with -- I'm going to start with a
16  few introductory questions to get some background.
17       Is there any reason while you sit here
18  today that your memory is impaired that would prevent
19  you from recalling the facts that are related to your
20  lawsuit?
21       **THE WITNESS:  No.**
22       MR. FEALK:  Okay.  Are you presently under
23  the influence of alcohol?
24       **THE WITNESS:  No.**
25       MR. FEALK:  How about illegal drugs?

Page 9

1        **THE WITNESS:  No.**
2        MR. FEALK:  And are you taking
3  prescription medication that would impair your memory
4  today?
5        **THE WITNESS:  No.**
6        MR. FEALK:  Okay.  In preparation for
7  today's deposition, have you reviewed any documents?
8        **THE WITNESS:  Yes.**
9        MR. FEALK:  What did you review?
10       **THE WITNESS:  I reviewed the -- the -- all**
11  **of the -- a few of the -- I'm sorry, I'm nervous.**
12       **I just reviewed all of the documents that**
13  **we -- we've already submitted to --**
14       MR. FEALK:  Are you saying that you
15  reviewed the documents that you gave to your attorney
16  and your attorney gave to us?
17       **THE WITNESS:  Yes.**
18       MR. FEALK:  Okay.  Now we received some
19  additional documents tomorrow -- or yesterday.  Is
20  there any reason why that wasn't provided earlier?
21       **THE WITNESS:  It was not provided earlier**
22  **because those documents are just my personal notes and**
23  **I did not know if that was admissible or meaningful**
24  **for this case.**
25       MR. FEALK:  Okay.  So what I'm

COURTNEY SMITH v FORD FIELD MANAGEMENT, LLC
SMITH, COURTNEY 04/25/2025

Job 40090
130..133

Page 130

1    discrimination?
2         I know how you feel, I'm just asking that
3    question.  That's not necessarily discrimination, is
4    it?
5  A.  If I'm only black female that works for him, and
6    I'm the only one that he's treating like this, I'm the
7    only -- he's best friends with all the rest of his
8    directors.
9  Q.  How do you know that?
10 A.  It seemed to me that he was.
11 Q.  Okay.
12 A.  Maybe except for one other one.  But he's good friends
13   with everybody, but when it comes to me, stone cold.
14 Q.  Isn't it possible that he thought you weren't doing a
15   very good job?
16 A.  We -- I don't -- I don't know how to answer your
17   question.  You'll have to rephrase it.
18 Q.  Isn't it possible that the demeanor that you saw was
19   because Todd didn't think you were doing a good job?
20 A.  You'll have to rephrase it.
21 Q.  You said that you felt that you're the only black
22   female, and Todd was being cold to you, that he was
23   being dismissive of you, but he never said anything
24   directly regarding race.
25        Well, couldn't it have been what you were

Page 131

1    feeling was that he thought you weren't doing a very
2    good job; isn't that possible?
3  A.  No.  Because I was doing a very good job.
4  Q.  Whether you were or you were not, isn't it possible
5    that Todd felt that you weren't?
6  A.  No, because I was doing a very good job.
7  Q.  So you don't think it's possible that Todd felt --
8  A.  I can't answer that question.  I don't know what Todd
9    thought or felt --
10 Q.  Fair enough.  Fair enough.
11 A.  You're asking me what Todd thought or felt --
12 Q.  Fair enough.  You don't know what Todd thought or
13   felt.
14 A.  -- and I cannot answer that question for you.
15 Q.  Okay, you just did.  Thank you.
16        MR. NACHT:  Off the record.
17        (Off the record at 3:07 p.m.)
18        (Returned to the record at 3:07 p.m.)
19 Q.  (By Mr. Fealk) You made a comment in your Complaint
20   about September '21, that a diversity, equity, and
21   inclusion and belonging council was -- was created and
22   the allegation that you're making is that two-thirds
23   of the members are white.
24        Are you sure about that, the DEI
25   Committee?

Page 132

1  A.  I believe at the time that I was on the DEI Committee
2    that that may have been true.
3  Q.  Okay.  So do you know if Veronica Bonner was on the
4    DEI Committee?
5  A.  Yes.
6  Q.  She's Hispanic?
7  A.  Yes.
8  Q.  You were on the DEI Committee, weren't you?
9  A.  Yes.
10 Q.  And we know what your race is.
11        Joe Keller, what was his role?  What was
12   Joe's Keller's role; do you know that?
13 A.  I believe Joe was a member of the DEI Committee.
14 Q.  Okay.  Do you know what his job was with Ford Field?
15 A.  No.
16 Q.  He was fired, correct?
17 A.  I don't know.
18 Q.  You don't know, okay.
19        Mo Pierson, do you know what his race is?
20 A.  Mo may have joined the DEI Committee a little later.
21   But, yes, he's black.
22 Q.  Okay.  Jessica Laramie, do you know who that is?
23 A.  Yes.
24 Q.  Is she black?
25 A.  Yes.

Page 133

1  Q.  She was on the DEI Committee, right?
2  A.  She came later, yes.
3  Q.  And Terrence Thomas is black also, correct?
4  A.  Yes.
5  Q.  And he was on the DEI Committee?
6  A.  Uh-huh.
7  Q.  Yes?
8        THE COURT REPORTER:  I need a verbal
9    response, please.
10       THE WITNESS:  Yes.
11 Q.  (By Mr. Fealk) And Eloui Litsema [phonetic], do you
12   know who that is?
13 A.  I do.
14 Q.  Okay.  And he's Hispanic, correct?
15 A.  I'm not sure.
16 Q.  You don't know, okay, fair enough.  Was he on the DEI
17   Committee?
18 A.  I believe so.
19 Q.  How about Amy Lemon, was she on the DEI Committee?
20 A.  I believe so, yes.  So she was a facilitator for it,
21   yes.
22 Q.  And she's white, correct?
23 A.  I believe so.
24 Q.  I believe so.  She's the director of HR, right?
25 A.  Yeah.

COURTNEY SMITH v FORD FIELD MANAGEMENT, LLC
SMITH, COURTNEY 04/25/2025

Job 40090
134..137

Page 134

1  Q.  Kind of important to have a director of HR on the DEI
2      Committee, right?
3  A.  Of course.
4  Q.  Okay.  Who is Steven Hamp?
5  A.  Mr. Ford.
6  Q.  Yeah, that's the --
7  A.  That's Sheila's husband.
8  Q.  That's Sheila's husband.  And Sheila, she's the one
9      that owns the team, right?
10 A.  Yes.
11 Q.  Kind of important to have him on the DEI Committee,
12     right?
13 A.  I don't recall.  Maybe he joined one Zoom call.  I
14     didn't know he was an official part of the committee.
15 Q.  What about Allison Maki, what's her role?
16 A.  Allison, CFO.
17 Q.  She's white.  She was on the DEI Committee, correct?
18 A.  At the beginning I believe she was.
19 Q.  So is it fair to say that the DEI Committee was a mix
20     of different people?
21 A.  When you say a mix of different people --
22 Q.  A mix of different people that worked in the
23     organization, different races?
24 A.  Yes.  There were a lot of different people on the DEI
25     Committee.

Page 135

1  Q.  Okay.  And at some point did you leave the DEI
2      Committee?
3  A.  I did not leave the DEI Committee.  I did see
4      something, a memo in the notes that Lindsay had
5      considered asking me to leave the DEI Committee
6      because of the low rating that Todd gave me on my
7      evaluation.
8  Q.  Okay.  But you were never actually asked to leave the
9      committee; is that what you're saying?
10 A.  Lindsay did -- no, I was never asked to leave the DEI
11     Committee.
12 Q.  Okay.
13 A.  But that memo that you're referring to is probably an
14     observation made about our interns being all white and
15     there was not one minority in the internship program
16     that year.
17 Q.  For what year?
18 A.  I'm assuming 2021.
19 Q.  Okay.
20 A.  It was the summer intern list, I believe.  Or it may
21     have been 2022.
22 Q.  Are you positive about that?
23 A.  No, I'm not positive about what year.
24 Q.  No, but I mean, are you positive that they were all
25     white interns?

Page 136

1  A.  I am positive about that because they posted a picture
2      of all of the interns.  And from the picture it looked
3      like not one was a person of color.  And when I
4      brought it up to my fellow DEI members a lot of them
5      agreed that they felt the exact same way, even some of
6      my white DEI members.  And they said that they were
7      also disheartened when they saw that picture being so
8      proudly displayed with not one intern of color.
9  Q.  You say in paragraph 36 that "Lindsay Verstegen voiced
10     concerns about defendant's failure to hire
11     minorities."
12         What exactly are you alleging that she
13     said?
14 A.  Can you read that again?
15 Q.  In paragraph 36 of your Complaint you're saying during
16     meetings with Chief Diversity Officer Lindsay
17     Verstegen -- I'm sorry, you voiced concerns several
18     times about defendant's failure to hire minorities and
19     she didn't believe in quotas.
20 A.  Yes.
21 Q.  What did you say to her and what did she say to you?
22 A.  Lindsay and I were having conversations.  She had just
23     started and so she was sharing some of her plans and
24     goals for DEI and some of the things that she wanted
25     to do.

Page 137

1          And when she first started she -- you
2      know, we had those conversations.  And so I
3      questioned -- I asked her what was she -- what were
4      her plans to bring more minorities here to work at
5      Ford Field.
6          And she told me, well, I don't believe in
7      quotas.  I don't believe in quotas.  And so --
8  Q.  Is there anything wrong with not believing in quotas?
9  A.  There's nothing wrong with not believing in quotas.
10     But I was trying to understand -- I felt like when I
11     asked her that that she felt like I was challenging
12     her authority in some way.  And that it was almost a
13     negative thing that I brought that up because I felt
14     her defenses were up a little when I asked kind of the
15     plans to bring in more minority hires.
16 Q.  Did Lindsay ever do anything or say anything that you
17     felt was discriminatory?
18 A.  Again, just the demeanor that she had when she sternly
19     told me that she didn't believe in quotas.  I felt as
20     though she was offended by me asking that question.
21 Q.  Were you -- Did you alter the time cards of Nisha
22     Collins and Stephen Rafferty to take overtime out of
23     their pay?
24 A.  No, I did not.  During Covid -- During Covid we were
25     told by payroll to make sure that we approved time

COURTNEY SMITH v FORD FIELD MANAGEMENT, LLC
SMITH, COURTNEY 04/25/2025

Job 40090
214..217

Page 214

1  A.  I probably glanced at it.
2  Q.  Okay.
3       (Deposition Exhibit #27 was marked for
4       identification.)
5  Q.  (By Mr. Fealk) So what this is, I'm going to tell you
6       what I think it is, but I'm going to ask you a
7       question to see if you -- it's a cover page and it's
8       the statement on discrimination -- on
9       nondiscrimination.
10      So would you have -- have you seen this
11      policy that I just gave to you on page 2?
12 A.  I don't remember seeing this policy.
13 Q.  Okay.  Fair enough.
14 A.  Especially in 2004.
15 Q.  Okay.
16 A.  Isn't there a new -- there should be an updated
17      version.  Where is the 2022, 2024?
18 Q.  I'm asking you if you've seen this policy and you said
19      you don't know; is that correct?
20 A.  I don't know.
21 Q.  But you do know there was a policy against
22      discrimination?
23      MR. NACHT:  Asked and answered.
24 Q.  (By Mr. Fealk) Yes?
25 A.  Asked and answered.

Page 215

1  Q.  Did you know you could complain to HR about
2       discrimination and harassment and retaliation?
3  A.  Can you repeat your question?
4  Q.  Did you know that you could complain to HR, human
5       resources, about discrimination and retaliation?
6  A.  I complained to HR about the biased treatment that I
7       was receiving.
8  Q.  So you knew you could complain about that?
9  A.  I did.
10      MR. FEALK:  Okay.  I have no further
11      questions.
12      MR. NACHT:  I just have one question.
13      CROSS-EXAMINATION
14 BY MR. NACHT:
15 Q.  Is there any doubt in your mind that human resources
16      and your boss, Mr. Argust, understood that you had
17      lupus which would have flare-ups?
18      MR. FEALK:  Objection, leading.
19      Go ahead.
20      THE WITNESS:  There is no --
21 Q.  (By Mr. Nacht) I'll rephrase it.  Do you have a
22      belief, yes or no, as to whether human resources and
23      your boss had knowledge that you had a chronic illness
24      that would cause you from time to time to need rest?
25 A.  Yes, they were aware of my flare-ups.

Page 216

1      MR. NACHT:  Nothing further.
2      MR. FEALK:  I don't have anything further.
3      MR. NACHT:  We will order.
4      MR. FEALK:  Yes.  I will take the
5  transcript as well.
6      (Deposition concluded at 5:53 p.m.)
7      - - - - - -
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 217

1  STATE OF MICHIGAN )
                     ) ss.
2  COUNTY OF GENESEE )
3
4
5      I, Colleen R. Joliat, CSR-0923, RPR, Notary
6  Public in and for Genesee County, Michigan, do hereby
7  certify that I conducted the examination of
8  COURTNEY SMITH a/k/a ALEXANDER, the deponent in the foregoing
9  deposition; that prior to the taking of said deposition,
10 the said deponent was duly sworn to tell the truth, the
11 whole truth and nothing but the truth; that the deponent
12 was carefully examined upon her oath; and deponent's
13 examination was reduced to typewritten form by me and the
14 foregoing two hundred sixteen (216) pages constitute a true
15 record of the testimony given by the aforesaid witness.
16      IN WITNESS WHEREOF, I have hereunto set my hand
17 this day in Grand Blanc, County of Genesee, Michigan.
18
19
20
21
       _____
22     Colleen R. Joliat, CSR-0923, RPR
       Certified Shorthand Reporter
23     Notary Public, Genesee County, MI
       My commission expires:  6-08-25
24
25